THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* FELIX
SOLOMON, Defendant.

Court of General Sessions, New York County, March 26, 1934.

*William C. Dodge, District Attorney,* for the plaintiff.

*Frank R. Galgano,* for Kermit F. Kip.

*James J. Park,* in person.

FRESCHI, J.   This is a proceeding on motion of the district attorney to punish the respondents as and for a contempt of court. The matter under consideration arose in the course of the trial of the case of The People of the State of New York against Felix Solomon, defendant, charged with and convicted, on his own plea, of grand larceny in the first degree.

Testimony was taken under an order to show cause served upon the respondents, Kermit F. Kip and James J. Park, directing them to answer why they should not be punished for contempt for certain alleged acts of misconduct set forth in motion papers; and the facts are as follows:

On February 9, 1934, this court, upon the application of the respondent Kip, made an order directing the warden of Great Meadows Prison, Comstock, N. Y., to bring before this court on

the 13th day of February, 1934, at ten o'clock in the forenoon, as a witness for the defendant Felix Solomon, one Charles Albero, detained as a prisoner in said State's prison. So much of this order as deals with the presence of the witness Albero and his remaining in court and which is material to this issue reads as follows: " *there to await the further order of this Court.*"

The respondent James J. Park is a keeper at Great Meadows Prison and the duly authorized agent of said warden, and as such was given the custody of Charles Albero to be delivered to the Court of General Sessions pursuant to said order.

The respondent Kermit F. Kip appeared for and acted as one of the attorneys in the defense of said Solomon.

Keeper Park left Great Meadows Prison on the night of February 12, 1934, with his prisoner, the witness named. They arrived at the Grand Central Station early on the morning of the thirteenth, and Park proceeded to and delivered his prisoner at the law office of the respondent Kip at 2 Lafayette street, New York city, where the said Charles Albero was questioned in private by the respondent Kip and his associates for the defense concerning the testimony he was about to give at the Solomon trial. The reasons given by Park for so doing appear hereafter in this memorandum. Said Charles Albero was shortly thereafter taken by said Park to the Court of General Sessions, where he remained with his charge without reporting to the court. During the recess period, Park and his prisoner left the court and lunched with the defendant Solomon and his attorneys, and returned thence to the court again for the afternoon session. At the close of the court on that day, Park and his prisoner again left the court and accompanied the group, consisting of the defense counsel and the defendant Solomon, to the offices of defendant's attorneys, where a second conference and examination of Albero was had. At its conclusion, Park and Albero went to the Dixie Hotel in Manhattan borough, New York city, where they registered and remained the entire night and until the next morning. Similar acts, visits and conferences occurred practically under like circumstances on the part of Park and his prisoner on the following days — the 14th, 15th and up to and including the morning of the 16th of February, 1934, when Charles Albero was called as a witness by the defense and gave his testimony before the court and jury. At no time from the thirteenth to the sixteenth did Park make known to the court, or any one in authority, the presence in court of himself and his charge, until Albero was actually called to testify. At the conclusion of his testimony, the witness, Albero, and his keeper, Park, thereupon departed from the court. The testimony in this pro-

ceeding further shows that, after Albero had concluded his testimony, the respondent Park neither asked nor waited for any court order or instructions in the premises.

When the Solomon trial was resumed at two o'clock after the noon recess on the day of the sixteenth, the district attorney requested and was granted permission to reserve his right to further cross-examine the witness Albero. The court, assuming that the said witness was at the time in the custody of the city prison authorities, directed that Albero be further held in the prison until the termination of the trial; and the trial of the case then proceeded as usual. At about four o'clock, after the clerk of the court had caused an investigation to be made, the clerk advised the trial judge that the said witness was not in court, and that he had never been committed to the city prison at any time and was not then confined therein. At this point, and for the first time, respondent Kip volunteered the statement that the respondent Park had inquired of him when recess had been declared that day, as to whether he needed the witness any more, and upon being told by counsel that they were through with him, Park and his charge left. It further appears that Kip then requested Park and the prisoner to return to his office at five o'clock that afternoon. The said keeper and the witness Albero were again called to determine whether they were present in court, and their failure to respond was noted in the record. Detectives of the district attorney were sent in search both of respondent Park and Albero. They were found entering the offices of said Kip at about five o'clock, and were informed of the directions of the court to return forthwith. These instructions were obeyed at once. After they got back to the court room, the defendant Felix Solomon withdrew his plea of " not guilty " and pleaded guilty as charged in the indictment.

The testimony further shows that while respondent Park and his prisoner together were at large during this interim, they visited the neighborhood of Albero's home in the borough of Manhattan, where the latter was allowed to meet and to be escorted by one of his friends and to go to other places, always in charge of the keeper, between the hour that they left the court at one P. M. up to the time they were found by the district attorney's detectives and returned to court. At this point, Park was examined under oath as to his conduct and his reasons for failing to remain in court to await the further order of the court. A transcript of that examination has been received in evidence upon the present hearing. At this hearing, Park, answering on his own behalf as to the circumstances under which he had taken Albero to counsel's office, testified that " The statement that I made about the Principal Keeper giving

me orders to go to Mr. Kip's office, but I did not tell it, did not say it in a way to tell a lie. I meant that I thought that by the order coming from Mr. Kip, Mr. Kip getting the order, and the order coming from him, that it was perfectly all right to take Albero to him." The "statement" to which Park alluded in his testimony was given under oath on the afternoon when he was compelled to return to court and to explain his reasons for removing Albero from the court trial room without the knowledge or consent of the court and before any instructions had been given him so to do. On that occasion, Park was asked the following questions in the course of the court's inquiry with reference to his going to counsel's office on the morning of the thirteenth, and he made these answers: " Q. How did you happen to go there? A. Well, they told me to report there, that he was their witness. Q. Who told you to report there? A. Well, they told me to report to Mr. Kip. Q. Who told you that? A. From the prison. Q. You mean the Warden who had given you the order? A. The Principal Keeper. Q. What is his full name? A. Verne N. Moorehouse. Q. Mr. Moorehouse told you to take the prisoner out and to report to Mr. Kip, the attorney for the defendant Felix Solomon, is that right? A. Yes. Q. And you obeyed that order? A. Yes."

These sections of the testimony are too plain to require any further comment. They speak for themselves.

The fact is that the principal keeper, according to his testimony, assigned Keeper Park, giving him a written order, and " told the officer to bring Mr. Albero down here to the Court and take him to the Tombs," and " to bring the man back after he got through testifying and was no longer needed as a witness in Court."

Park admits he also had a certified copy of the court order of February 9, 1934, and his having read that part of it which required him " there to await the further order of this Court." Plainly, respondent Park disobeyed this direction in the said order.

The regular procedure would have been, in any event, for Park to get his instructions from the court, and more particularly after Albero had testified to return forthwith or as soon as possible his prisoner to Great Meadows Prison, unless the witness Albero's presence might be further required at the trial, in which case he would, in the nature of things, have been held in custody in the city prison here until further order of the court. This Park failed to do.

The provisions of section 10-c of the Code of Criminal Procedure, which provides the procedure for obtaining an order to bring up a prisoner to testify as a witness upon notice to the district attorney, commands it as the duty of the warden, or his authorized representative, to obey the order issued in this case and to " *make a return*

*accordingly,"* as provided in the Code. The required notice mentioned in this section was waived by the district attorney; and thereupon the order for the attendance of the prisoner as a witness was prepared and submitted by the respondent Kip.

The claim now made by the district attorney is that not only has the order in question been violated by the respondents, but also the said Code requirement and the Judiciary Law of this State; and that, therefore, the respondents should be subject to the penalties prescribed by law for a criminal contempt.

Section 750 of the Judiciary Law (Cons. Laws, chap. 30) provides, in part, and so far as it is pertinent to this case, as follows: "A court of record has power to punish for a criminal contempt, a person guilty of the following acts, and no others: * * *

" 3. Wilful disobedience to its lawful mandate."

Assuming, for the purposes of this motion, that the bringing of the prisoner Charles Albero by the keeper before the court constitutes the making of " a return," as provided by the section of the Code of Criminal Procedure (*supra*), the remaining vital question here is whether or not there has been a substantial compliance, on the part of Keeper Park, in view of the circumstances of this case, with the terms of the order *" to await the further order of this Court."* Unquestionably, counsel, who obtained the order, and the keeper knew the specific directions of the court's mandate.

Those who actually participated, aided, abetted, counseled or commanded in the taking of this witness from the presence of the court, except when all witnesses were excluded temporarily from the trial room, without the knowledge, consent or order of the court, were undoubtedly violating the very letter, as well as the spirit, of such mandate. (*People ex rel. Drake* v. *Andrews*, 197 N. Y. 53, 56.) Whether the misbehavior here charged and appearing in the evidence in this proceeding was misconduct or was " wilful " is one of the questions to be determined.

The willfulness contemplated by the statute must be such behavior as would justify the belief and conviction that there was a deliberate intent either to question or defy the authority of the court, offend its dignity or to evade the mandate of the court so as to interfere with the due administration and the processes of justice. (3 Whart. Crim. Proc. [10th ed.] § 1893.)

In *People* v. *Foster* (204 App. Div. 295; affd., 236 N. Y. 610), where the willful refusal to produce certain documents before a joint legislative committee in violation of section 1330 of the Penal Law was considered, the court said (at p. 300), on the meaning of " wilful " in the statute, quoting from *Wass* v. *Stephens* (128 N. Y. 128): " the word ' wilfully ' * * * means something more than

a voluntary act, and more also than an intentional act which is in fact wrongful. It includes the idea of an act intentionally done with a wrongful purpose, or with a design to injure another, or one committed out of pure wantonness or lawlessness." (See, also, *Matter of Gilchrist*, 130 Misc. 456, 483; *North* v. *Foley*, 267 N. Y. Supp. 572.) Such intent must enter into and characterize the acts complained of. (*People ex rel. Munsell* v. *Court of Oyer & Terminer*, 101 N. Y. 245, 248.) There can be no question as to the power of this court to punish for criminal contempt. (See Judiciary Law, §§ 750 *et seq.; Eastern Concrete Steel Co.* v. *B. & M. Plasterers' International Union*, 200 App. Div. 714.)

Such willfulness may be committed through acts of commission or omission. For instance, concealment or a positive misstatement might well form the basis of it. (See the case of the juror's contempt who was guilty of such wrongs, *Clark* v. *United States*, 289 U. S. 1.) In this latter case, the late Chief Justice WHITE's language in *Ex parte Hudgings* (249 U. S. 378, 383) is quoted with approval and lays down a guiding rule as follows: "An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is * * * the characteristic upon which the power to punish for contempt must rest."

The order of February 9, 1934, did not direct that the said Charles Albero stand committed to the custody of the warden of the city prison of the city of New York until thence delivered by due course of law upon his arrival in that city from Great Meadows Prison; and while the failure of the respondent Park to take his charge to the nearest city prison, as ordered by his principal keeper, may constitute an infraction of administrative instructions for which he might be disciplined, the fact that Park kept Albero in his custody and constantly under his immediate personal control outside the city prison does not in and of itself constitute a violation of the order of this court under the peculiar provisions of the order in question. Had the order provided, in the first instance, for the detention of Albero in the city prison upon his arrival in the city of New York, then there could have been no doubt about the guilt of the respondent Park for his failure to deliver his prisoner to the custody of the warden in execution of such an order. *People ex rel. Illingworth* v. *Oyer & Terminer* (10 App. Div. 25) is a case where a deputy sheriff was designated as a guard charged with the duty of conveying persons committed by the criminal courts to the city prison when required to do so. A commitment had been made and delivered to the sheriff. Having the custody of the prisoner, he failed to execute the warrant for a period of over seven hours, during which time he permitted the prisoner to walk about the

city, took him and kept him at a bath house, far removed from the city prison, without authority to do so. For this willful disobedience of the lawful order of the court, he was adjudged guilty of criminal contempt and accordingly punished. The writ of certiorari issued to review the proceedings was dismissed by the Appellate Division and the order was affirmed.

Failure to obey an order which is contradictory, or failing to do something not specified in the order, cannot be punished as a contempt. (13 C. J. § 17, p. 15.) The language must be unmistakably clear in order to justify the allegation of and the punishment for misconduct. The statute (*supra*) defines the cases in which it may be imposed; and the court must take care to avoid the exercise of arbitrary authority. (*People ex rel. Munsell* v. *Court of Oyer & Terminer*, 36 Hun, 277; affd., 101 N. Y. 245.) While criminal contempt is an offense against public justice, with a penalty which is essentially punitive, behind it there is to be found some trace of private rights. (*King* v. *Barnes*, 113 N. Y. 476, affg. 51 Hun, 550.) Necessarily, these contempts in their origin and punishment partake of the nature of crime, and they should be invoked with care and only in a proper case. (*Toledo Newspaper Co.* v. *United States*, 247 U. S. 402, dissenting opinion, per HOLMES, J., at p. 425.)

The right to punish for contempt is so powerful a weapon that it should not be used under any circumstances to promote judicial tyranny. True it is that courts ought not to arrogate to themselves undue rights, yet in these times, when officers of the law in certain localities are openly criticised for their conduct in criminal cases, when the efficacy of our courts, which should always be a matter of primary importance, is a topic of such general discussion, when law enforcement agencies and machinery are openly questioned and attacked, and when criticism has been carried, in some instances, even to the extent of undermining the public confidence in our courts, nothing should be left undone to compel obedience to law and respect for every lawful mandate of the court. Every proper measure should be taken and every possible means invoked to uphold the processes of public justice.

Unquestionably, it affirmatively appears that Park is guilty of disobeying as much of the court order in question as required him, after reporting to the court with his charge, to await the further order of this court. Disobedience and misbehavior of this sort calls for a reprimand at least, even though the conduct of said keeper were to be regarded as a technical contempt. Anything that tends to obstruct the fixed course of justice is contempt. Petty violations breed greater ones; and, as has properly been written: " Where

law ends, then tyranny begins." Administrative officers and their subordinates who, directly or indirectly, treat lightly or with indifference any order of a court should promptly be called to task and made to answer why punishment therefor should not be imposed according to law. The explanation which this particular respondent has given is that he took the prisoner Albero to the office of defendant's counsel because his (Kip's) name was on the papers; and that he believed it to be a compliance with the directions contained in the order if Albero was actually present in court during the sessions of the trial. Furthermore, he felt that when the respondent Kip had stated to Park that Albero was not needed any longer as a witness, his conduct was not improper. Such explanation is open to much suspicion, to say the least, in view of the most extraordinary testimony given at the trial by said Albero, the veracity of which has been seriously questioned. Whether there was an outside influence to induce Albero to testify as he did, the court need not pass upon here. If the failure of Park to remain in and await the further order of the court was based upon an honest conviction that the examination of Albero at this trial was concluded and that the presence of the witness was no longer required, it seems incredible that he would have left without a specific release from the presiding trial judge. In fact, the witness Albero had not been excused, and under the terms of the order it was directed that he be kept there until the mandate was in every sense obeyed. The order was clearly in full force and effect during the trial and until its close, unless meanwhile the court otherwise ordered. The court still had jurisdiction over Albero, and its evident purpose was to prevent the removal or release of this prisoner, then detained under and by virtue of the execution of sentence already pronounced by a court. Where an officer charged with so important a duty, involving necessarily so great a responsibility as taking custody and guarding against the escape of a prisoner while being brought to court to testify, the overstepping of the strict line of duty in the slightest degree necessitates holding such officer to the strictest accountability. (*People* v. *Carnley*, 3 Abb. Pr. 215, 218.) The language of the order is unequivocal; it clearly imports that the prisoner was amenable to this court which was empowered to issue the writ in the first instance and authorized to command disposition of the witness, even though he was still in the custody of the warden or his representative who produced him in court under the order or writ to testify. The keeper could not place himself above the court or the law and its lawful mandate. Such orders and injunctions are not to be trifled with or trampled upon. (*People ex rel. Stearns* v. *Marr*, 181 N. Y. 463, 468.) The keeper has admitted in his

testimony that he was fully aware of the directions of the order, and that he possessed a certified copy of it and knew its contents, and clearly understood the nature of the acts required to be performed under it.

On the question of willfulness of the respondent Park in dealing with the subject of the court order, testimony of the witness Moorehouse was taken respecting his instructions to Park. There is no holding, nor an implication that disobedience of those instructions constitutes a basis for court action here; but, certainly, that evidence is competent to show the state of mind of said respondent, and what, if any, possible motive he had for violating the court order. The evasion of his full duty and the breach of his administrative instructions, under the facts and circumstances of this case, have resulted in the suspension, to be followed probably with some form of punishment of Park by the State Department of Correction, which, through its Commissioner, has the power to discipline Park for such infraction of the orders; and then, again, such matter may be and ought to be considered on the question of punishment, if any, here. Certainly, a keeper who has a prisoner in charge should not, as was done in this case, grant all kinds of strange requests which a prisoner might make. There was one thing for this keeper to do, after reporting directly to the court in pursuance of its order, namely, to ask for specific instructions from the court in the premises and to abide by them.

I, therefore, hold James J. Park guilty of criminal contempt of the order of this court.

Regarding the respondent Kip, it may be stated he may be a partisan in the interest of his client; but if the lawyer in the case countenances such violation of the court order, which he prepared and secured, his conduct is reprehensible. The ethics of every situation is a part of substantial justice. While counsel may have the right to interview his client's witnesses, even where one is held in custody, under these given circumstances, such privilege must not be abused or carried to the extent either of affirmatively ignoring the court's order, or by concealment of the facts or any indifference toward such order. As an officer of the court, it is his duty to see to it that the court's authority and mandate are in no sense or wise disregarded or treated with contempt, or its dignity and authority offended directly or indirectly. If he be guilty of such misconduct, even where it does not assume the proportion of willful contumacious conduct, then the lawyer involved is subject to such disciplinary measures as can and may be invoked by lawful authority.

Lawful mandates are made to be obeyed; and if their disobedience were to be treated with indifference by the court, it might become a

commonplace matter to disobey them. The order in question was full of vitality; and it defined and drew a clear line of demarcation of duty. Lawyers have a duty to the court and the public as well. It is proper and necessary for them to prevent interference with the due administration of justice. By example, they must set a high standard so that others may all the better be able to determine their course of conduct, and, with a proper sense of obligation, decide what ought to be done in all similar matters.

The very essence of law enforcement involves, primarily, on the part of a lawyer, as an officer of the court, a recognition of his sworn duty not alone to obey where he directly is properly commanded to do a given thing, but, also, to see to it that every lawful mandate is carried out and executed. His obligation is not to counsel or conceal a violation of such mandate. This duty he owes the court not as a mere matter of courtesy, rather as one of law and order and ethics.

The purpose of this memorandum of decision is to serve as a timely warning to others who might find themselves in the future similarly situated as these respondents, so that henceforth in such cases it would not be cause for confusion for any keeper or attorney as to what is the proper course of conduct. Both respondents have been enriched in their knowledge of such matters by this experience. So far as the respondent Kip is concerned, if from all this it can be discerned that there is nothing worse than an honest but yet ignorant mistake which requires explanation, nevertheless, I am satisfied that there has been here presented a most extraordinary and remarkable state of facts which outrages one's sense of right and wrong. If for one moment I thought this was a premeditated scheme by Kip to delude the court and interfere with the administration of justice and as a blow at the authority of the court, punishment as provided. by statute would inevitably follow and be meted out to the guilty party without any hesitancy.

The question before me is whether the respondent Kip is guilty of a criminal contempt as distinguished from a civil contempt. It is well recognized that the former is a public contempt and that the latter is a civil or private contempt.

The explanation made by the respondent Kip indicates that he did not intend to offend the authority of the court or impede the trial in any way. Respondent Kip has denied giving any instructions or of having caused any such to be given to bring Albero to counsel's office, or to keep Albero at a hotel between the court sessions. He states that he did not know where Albero was or went after leaving his office and never inquired where or how Park and Albero spent their time and nights. Kip testified that he assumed that the " further order of the court " was being complied with,

although he admits that he did no particular act to find out whether it was being complied with or not.

The respondent Kip further testified that it did not occur to him that something should have been said to Park as to whether or not the prisoner Albero should be confined to the Tombs or some other penal institution during his stay here, inasmuch as Albero was Park's or the State's prisoner and "not mine." He added: "I did not know that I had to inquire where he was being kept. To be perfectly truthful with you, I am not at all familiar with the penal regulations. I cannot say that I have ever read them as a matter of fact." This respondent very frankly testified that it was not his "purpose in any manner, shape or form to wilfully disobey or cause to be disobeyed the order of the court in this case." He said: "I never considered it [the order] being violated. * * * It was never my intention to have any contempt of court in this case. If I have overstepped, then it is only due to inadvertence, or perhaps my ignorance of what the correct procedure should have been in a case like this. I had never had one before; I assumed that I was doing the right thing. There was never any intention to wilfully violate any order of the Court. If my acts constitute a violation of any order of this Court, I certainly feel that I humbly apologize and ask Your Honor's indulgence, due, perhaps, to my inadvertence."

It must be said, however, to the credit of the respondent Kip that, when the court was compelled to suspend because of the absence of the witness Albero on February 16, 1934, he volunteered the information that the keeper and his prisoner had departed; and that he expected them to meet him later on that day.

Under all the circumstances, I have a doubt that the acts of Kermit F. Kip is a contempt at all; and, at any rate, I am satisfied that the respondent Kip cannot be found guilty of any willful disobedience of the said order such as would constitute his conduct and acts criminal contempt. And with respect to the punishment of the respondent James J. Park, I believe the ends of justice will be satisfied if a fine or imprisonment such as might be imposed under section 751 of the Judiciary Law is suspended, more especially in view of the fact that, considering the conclusion of this case wherein this defendant Solomon finally confessed his guilt and was ultimately sentenced to serve a prison sentence, there has been no miscarriage of the public prosecution here. The authority of the court has been finally vindicated. Let those who might have occasion to use this decision remember that this disposition should not be taken as a precedent for like treatment where other facts might appear requiring a penalty.

Ordered accordingly.