In the Matter of FRANK GUMBS, Petitioner, *v.* JOSEPH A. MARTINIS, as Supreme Court Justice of New York County, Respondent.

First Department, December 14, 1972.

*Rhonda Copelon Schoenbrod* and *James Reif* for petitioner.

*Robert S. Hammer* of counsel (*Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General*), for respondent.

McGIVERN, J. This is a proceeding pursuant to article 78 of the CPLR to review the mandate of the Supreme Court, New York County (MARTINIS, J.), dated November 8, 1972, summarily adjudging the petitioner in contempt of court for conduct committed in the presence of the court, imposing a sentence of $250

fine or 10 days' imprisonment, and excluding the petitioner from the Criminal Court Building, 100 Centre Street, New York, N. Y., while the case of *People* v. *Richard Moore* was on trial before MARTINIS, J.

The petitioner, it seems, is associated in some capacity as a "writer" with the Panther Party newspaper, known as *Right On,* and is represented as no stranger to the courts, having been seen over the years as a frequenter of the courtrooms and corridors of 100 Centre Street. This is to be gleaned from the papers submitted by the petitioner, including the affidavit of Deloris Costello, who describes herself as a reporter for WBAI-FM, and "involved in reporting trials of political activists in the Supreme Court of New York". It is to be noted she observed him distributing literature on request: "I have only seen him give literature to people who specifically ask". The affidavit of MARTINIS, J., says: "Petitioner Gumbs is no stranger to the Criminal Courts Building. He has been a frequent spectator at these trials; court officers and policemen have informed me that on a number of occasions they have seen him distributing Black Panther or related literature in and around the courthouse; and has even been depositing leaflets under spectators benches."

The unfolding drama leading up to his contempt began innocently enough on October 26, 1972, when a prospective juror struck up a conversation with him in the corridor outside Trial Part XXXVI. In this Trial Part, the jury selection process was going on, in a case involving the attempted murder of two policemen with a machine gun. And in certain remarks before the panel of jurors, defense counsel made reference to the Black Panther party, of which the defendant was a member. At the time in question, out in the corridor, petitioner was alone and aloof. And he did not initiate the conversation with the prospective juror; although it cannot be said the prospective juror was not unaffected by the encounter, for in narrating the incident, she (a Mrs. Levine) testified that she saw the paper *Right On,* "three [papers] together, plus something else underneath" next to petitioner as he sat alone "quite by himself in a corner and minding his own business." The paper attracted her attention. She asked to glance at the paper. The contents were "so completely negative about the United States", and in answer to a query by her, petitioner "spouted" his views about injustice in the United States. Thus, the need for insulating other prospective jurors from a possible unfavorable reaction to the party cannot be ignored.

The circumstances of this encounter, however, seem to have been carried back to the Presiding Justice in a fashion not completely accurate. Given the impression that the petitioner had been propagandizing, and openly displaying various papers, MARTINIS, J. convoked a hearing in the robing room, the petitioner initially not being present. Then he summoned the petitioner, ordered him to keep out of the courtroom, the corridor and the building and after several interchanges, including a trenchant personal taunt by the petitioner, directed at the Judge, the following developed:

"A MAN [Petitioner]: But I'm going to continue coming in this building. If you want to bust me, go ahead.

"THE COURT: O.K.

"A MAN: You know what I am. Just go ahead and do that. I understand. Because you know what you are, you're a fascist weak pig.

"THE COURT: All right.

"A MAN: That's what you are.

"THE COURT: Now, I could hold you for contempt, what you said.

"A MAN: Hold me for contempt. I'm not intimidated by fear from you. I've been in this country four hundred years being fucked over by people like you.

"THE COURT: Because of disrespect and your language.

"A MAN: Who are you for disrespect? Ninety-eight percent of the people in your concentration camps are black and Puerto Rican.

"THE COURT: You are contumacious.

"A MAN: Ninety-eight are Puerto Rican.

"THE COURT: — and I'm holding you in contempt and adjudging you in contempt and I'm fining you two hundred and fifty-dollars or ten days in the work house".

Then, following an intervention in his behalf by Mr. Bloom, the attorney for the defendant on trial, the court said:

"THE COURT: I'll take your suggestion. I'll vacate the contempt. Outside. Go outside. And remember my directive."

Come November 8, 1972, or about two weeks later, the petitioner reappeared in Trial Term XXXVI, apparently again with papers in his hand, as he had previously, and with the case of *People* v. *Moore* then in full progress. It is noteworthy that in the interim the petitioner took no steps to nullify the exclusion order, nor did he make any effort to lift the ban, although he seems to have been knowledgeable in the ways of the courts and to have had ready access to legal help. He made no timely

application; and he proffered no explanation. (*Walker* v. *City of Birmingham*, 388 U.S. 307.) In our view, if he thought the grounds for his ban to have been infirm, as indeed, they may have been, he had his remedy, as available to him then as in the instant proceeding. (*Matter of Katz* v. *Murtagh*, 34 A D 2d 517, affd. 28 N Y 2d 234; Judiciary Law, § 752.) But he was not free to flout the court's charge. (*Walker* v. *City of Birmingham*, *supra*, p. 320.) He had been warned by Mr. Bloom, his informal counsel on October 26, 1972, that he was bound by the court's order and was inviting contempt and could be jailed if he disobeyed the order. And the Judge's parting words on October 26, 1972, were: "Remember my directive".

And so on November 8, 1972, the following developed:

"THE COURT: Didn't you appear before me last week?

"THE MAN: I was in this court, but it wasn't last week, it was the week before.

"THE COURT: The week before.

"THE MAN: In your chambers.

"THE COURT: Yes, and I directed you and ordered you to stay out of this Court and out of the corridors of this courtroom while this Court was in progress, otherwise I would hold you in contempt.

"THE MAN: For what? For what reason?

"THE COURT: Because I ordered you out.

"THE MAN: That ain't good enough. You can't arbitrarily keep the public out of a courtroom. My behavior has been exemplary in this building, and you cannot hold the public out of a courtroom arbitrarily and fascistically.

"A SPECTATOR IN THE COURTROOM: That's right.

"COURT OFFICER: Quiet.

"THE MAN: My behavior has always been exemplary. I've always acted in accordance with the rules and regulations of this Court.

"THE COURT: All right, I am ordering you out of this courtroom. I'll give you an opportunity to purge yourself by leaving this courtroom right now.

"THE MAN: Well, I'm sorry, I'm not abiding by that. I don't intend to obey it. This is a public building.

"THE COURT: I adjudge you in contempt of this Court for violating this Court's order, and I'm fining you $250.00 or ten days in jail. Put him in. * * *

"THE COURT: Yes, but I, as the presiding Justice of this Court —

"THE MAN: Who are you, Hitler?

"THE COURT: —am ordering you out of this courtroom and out of the corridors of this hall.

"THE MAN: This is my area of work.

THE COURT: Your exception is on the record. Put him in.

THE MAN: My area of work is to assist political prisoners in your concentration camps, to arouse the political consciousness of the people, and I'm not letting you, in a Fascist order, keep me out of a public building. You are wrong and you know you are wrong.

"THE COURT: I made my statement for the record. I'm adjudging you in contempt."

In our view, it does not seem to be unrealistic to conclude that petitioner returned to the court's presence in order to welcome or be the catalyst of a disrupting incident. This seems to be a fair inference, in the light of his previously displayed truculent attitude towards the Bench on October 26, 1972, and his instantaneously intransigent attitude to the same Bench on November 8, 1972. And motivation is important. "The key of course is the motivation which produced the disruptions." (BREITEL, J., Matter of Katz v. Murtagh, supra, p. 241.) He deliberately returned, although under a ban, to the same audience of court attaches, attorneys, parties, jurors, etc. This fresh affront obviously was courting an outbreak or at least, a public reaction from the Bench, and in our judgment, his unbridled and provocative language, in open court, and the contemptuous manner in which he refused to obey the court, showed a calculated disrespect for the authority and dignity of the court, warranting a punishment for contumacious behavior committed in the immediate presence of the court, pursuant to section 750 of the Judiciary Law.

We cannot accept the view of the dissent that petitioner's conduct on November 8, 1972, when there was a continuing and renewed direction to stay out of court, did not disturb the court's business and was not an attempted "demoralization of the court's authority before the public". This is aside from any antecedent conduct which abusively challenged the court's authority to preserve from taint the integrity of an ongoing trial and prevent an interruption of the trial process. As stated by BREITEL, J., in Matter of Katz v. Murtagh (supra, pp. 240-241): "Nor are there alternatives to summary action except at the expense of fulfilling the frustration intended. Alternatives requiring pyramided collateral proceedings and delays would be worse than the contempts."

In our judgment, the Trial Judge, according to his lights, and based on the information he had, and based on his own encounter with the petitioner, in his own mind was justified in ordering the petitioner out of his courtroom lest he disrupt the trial then in progress. And on November 8, 1972, the petitioner, in a contemptuous and contumacious manner, refused to obey the court. The record is clear:

"THE COURT: All right. *I'm ordering you out of this courtroom.* I'll give you an opportunity to purge yourself by leaving this courtroom right now. (Italics mine.)

"THE MAN: Well I'm sorry, I'm not abiding by it. *I don't intend to obey it.*" (Italics mine.)

Thus, we sustain the Trial Judge. He alone evaluated the situation, and he alone had the duty to safeguard the integrity of the case on trial before him, and the right of that defendant to an impartial jury. He afforded the petitioner an opportunity to avoid contempt, i.e., by leaving the courtroom, and since petitioner defiantly and fractiously refused to obey the court mandate, we view this as a proper case for the exercise of the court's summary power, as in *Matter of Douglas* v. *Adel* (269 N. Y. 144) and the conviction is sustained, and the petition is dismissed.

We can do no other. The alternative we hesitate to contemplate. Failing to sustain the court's sanction, under the totality of all the prevailing circumstances, would result in a complete stultification of the trial court's authority. In this day, particularly in trials where there is a " political activist " overtone, and where such an undue stress and strain is placed on the Trial Judge, his hand and his authority over his own courtroom must be upheld, whenever the authority is not improperly or oppressively exercised. Otherwise, the trial process, as we have known it, will come to chaos and dissolution.

Accordingly, under the totality of circumstances and the full context of this episode, the adjudication of contempt should not be disturbed*.

---

* It cannot be said that the petitioner had no opportunity to make a choice between payment of the fine and remaining in jail. It is apparent from the record that petitioner "had from 11 o'clock to 5 to raise the money ", and there is no expression of a desire to so do during that time, although he was visited by his wife, who had been in court that day. Nor during that time was there a request for a stay, pending an opportunity to defray the fine. The question of indigency was not pressed; and no election to pay the fine was made "until late in the afternoon of November 8, 1972 ", after denial of the motions to vacate the contempt and stay execution. Cf. petitioner's petition, verified by his attorney, Rhonda Copelon Schoenbrod, dated November 14, 1972. And see, also, her

Stevens, P. J. (dissenting). The question to be resolved is not whether a court has the power to hold a person in contempt. It has such power. Rather the question is whether respondent acted within the exercise of such power or in excess of it.

Section 750 of the Judiciary Law declares the power of a court to punish for criminal contempt and enumerates the acts or grounds upon which such action shall be based. Without reciting at length all of the various grounds there set forth, reference is made only to those eventually enunciated and adopted by respondent, namely, subdivisions 1, 2, 3 and 4 of section 750.

Section 750 of the Judiciary Law, headed "Power of courts to punish for criminal contempts", states:

" A. A court of record has power to punish for a criminal contempt, a person guilty of any of the following acts, *and no others*:

" 1. Disorderly, contemptuous, or insolent behaviour, committed during its sitting, in its immediate view and presence, and *directly tending* to interrupt its proceedings, or to impair the respect due to its authority.

" 2. Breach of the peace, noise, or other disturbance, *directly tending* to interrupt its proceedings.

" 3. Wilful disobedience to its lawful mandate.

" 4. Resistance wilfully offered to its lawful mandate." (Emphasis supplied.)

The foregoing was specified for the first time after petitioner was incarcerated, and then only in response to a query from counsel then appearing for petitioner. In our view subdivisions 1, 2 and 4 clearly do not apply. Reference to the mandate of commitment reveals that respondent apparently rested its determination upon subdivision 3 of section 750. The mandate declares petitioner " having been summarily adjudged guilty of Contempt of Court in that he Contemptuously and Contumaciously refused to obey in the presence of the Court a *lawful order* to remain outside of the Court Room and the corridors *after he had been previously ordered and directed by this Court to remain outside the said Court Room and the corridors;"* (emphasis supplied), is directed to pay a fine of $250, and in lieu of such payment is committed for 10 days.

Petitioner is identified in the record as a reporter or writer for the newspaper *Right On,* and as a member of the general public.

---

letter of the same date, addressed to this court revealing that "the petitioner Frank Gumbs did on the evening of November 10, after serving one-quarter of his sentence, pay under protest the fine imposed by Justice Martinis and is presently at liberty". Since the issue of his financial means is not raised, the motives of the choice to remain in custody are not clear. Thus, the situation is not within the rationale of *Tate* v. *Short* (401 U. S. 395 [1971]).

The incidents which gave rise to this proceeding may be summarized briefly. A recess was taken during the trial of *People* v. *Moore* which was then underway. After the recess the trial was continued and an incident occurred in chambers at which the court, a Mr. Bloom, attorney for defendant Moore, and Assistant District Attorneys O'Reilly and Huland were present. A Mrs. Levine, identified as a prospective juror, was brought into chambers. The court stated it had been brought to his attention that someone outside had been talking to prospective jurors. He then proceeded to question Mrs. Levine who revealed that she observed a man " quite by himself in a quarter [*sic*] and minding his own business " who was eating a hamburger and some liquid. Mrs. Levine approached the man who had a paper *Right On,* actually three together, beside him. Mrs. Levine requested and received permission to look at the paper. According to her she " just glanced at the first part " and engaged the man in conversation. They did not discuss the trial. She had not observed the man (who was in the corridor) talking to anyone else nor did she observe the man give the papers to anyone. He was minding his own business. Mrs. Levine was excused and the court advised Court Officer DeSanto, who had observed Mrs. Levine talking to the man, that " I want that man barred from the courtroom and from the corridors outside the courtroom." Mr. Bloom protested that the lady had said the man was sitting by himself. From the ensuing colloquy it appears that *Right On* is a paper of the Black Panther party. Assistant District Attorney O'Reilly offered to consent to " a full evidentiary hearing " to show that some two weeks previously this man had been " handing out pamphlets, a mimeographed sheet " in front of the courthouse. Mr. O'Reilly then requested on the basis of that " and what happened today, even though he didn't initiate the conversation " that the man be barred from the courtroom, the corridor and the building. The court responded, " Absolutely. That goes." The court noted there was nothing in the record that the man distributed anything, but his exposing what he had was " just as bad as distributing." Mr. Bloom again protested that if people could carry around a daily paper exposed which referred to Moore as a minister of violence, people should be allowed to carry around *Right On.* Mr. O'Reilly then said that the crime would occur when the man comes into the courtroom, or on this floor and he's charged with contempt. The court then directed " if he's outside bring him in." " A man " (the way the minutes identify petitioner throughout most of the proceedings) was brought in

and the court informed him briefly of what had occurred, concluding:

"Now, I don't know who you are. I don't know where you're from, but I am giving a direction, in view of the fact that you have these papers exhibited where a prospective juror can see them, I am ordering that you be kept out of the courtroom, out of the corridors of this building and out of the building itself."
Petitioner was informed if he disobeyed that order he would be held in contempt.

"A MAN: I was here (indicating). She was standing over there (indicating). She walked all the way over out of her way.

"THE COURT: I am not asking you any questions. I've made a directive, and if you violate the directive, I'll take appropriate action."

Mr. Bloom objected and suggested the effectiveness of the order be stayed until the man could obtain representation. His request was denied, whereupon petitioner, always identified in the minutes as "A MAN", spoke up. After noting that he was a citizen of the United States, the further language used was abusive and its use cannot be condoned.

The court thereupon adjudged petitioner in contempt and imposed a fine of $250 or 10 days. Mr. Bloom noted that what transpired did not take place in a courtroom, and "A MAN" stated "You asked me in here. I wasn't under arrest." The court then vacated the contempt and added "Outside. Go outside. And remember my directive."

Some two weeks later "THE MAN" (as this portion of the record identified him), entered the courtroom where the trial was in progress. He was then called before the Bench, reminded of the direction given earlier and advised that he would be held in contempt "for what transpired in the robing room" "THE MAN" said "Yes, and what did the woman say?"

"THE COURT: I'm not interested in what the woman said. It's on the record. I directed you to stay out of this courtroom and out of the corridors of this courtroom."

"THE MAN: Well I'm sorry, I'm not abiding by that. I don't intend to obey it. This is a public building.

"THE COURT: I adjudge you in contempt of this Court for violating this Court's order, and I'm fining you $250.00 or ten days in jail. Put him in."
Other conversation followed but the adjudication was not changed. Later the court learned from the Clerk that "THE MAN's" name is Frank Gumbs. Applications subsequently made by counsel who appeared for petitioner for a stay to afford peti-

tioner an opportunity to raise the money were denied by respondent and, later, by an Associate Justice of this court.

Portions of the record have been set forth in order to afford a proper determination of the question in issue — namely, was there a lawful mandate issued to which there was willful disobedience by petitioner.

" ' Mandate ' includes a writ, process or other written direction, issued pursuant to law, out of a court, or made pursuant to law, by a court, a judge or person acting as a judicial officer, and commanding a court, board or other body, or an officer or other person * * * to do or to refrain from doing an act therein specified " (General Construction Law, § 28-a). The definition does not exclude an oral command or order (*Silverman* v. *Seneca Realty Co.*, 154 Misc. 35). Such direction, command or order must be lawful, i.e., legal, warranted or authorized by law.

The record reveals that immediately upon petitioner's entry into the chambers in response to the court's directive to a court officer to " bring him out " (so in record), and before petitioner was asked a question or could utter a single word, he was informed by the court that the court was giving a direction. The precise language was " I am ordering that you *be kept out* of the courtroom, out of the corridors of this building and out of the building itself." And later advised, " I am not asking you any questions. *I've made a directive,* and if you violate the directive, I'll take appropriate action " (emphasis supplied). Later, petitioner is advised by the court " remember my directive." The foregoing can hardly be construed as a mandate directed to petitioner. What transpired thereafter, while regrettable, is of little moment because the punishment is not based thereon.

The order or command had been issued to another, presumably a court officer, that petitioner *be kept out* of the premises and specified portions thereof. The direction was not that petitioner *stay out,* but that he be *kept out.* The order was of indefinite duration with no time limit expressed. At that point petitioner had not been permitted to even speak in his own behalf. A mandate of an issuing court must be clear and free of ambiguity before its violation can subject one to punishment for criminal contempt (*Matter of Spector* v. *Allen,* 281 N. Y. 251; *People* v. *Solomon,* 150 Misc. 873). The court's statement to petitioner was " she [Mrs. Levine] saw some papers which you were ' exhibiting ' [the court's language, not that of Mrs. Levine], and you engaged in a conversation with Mrs. Levine

regarding ' the contents of the papers and certain philosophical views.' '' It is a strained construction to conclude this gave adequate reason for the directive. Moreover, '' exhibiting '' represents the court's interpretation of Mrs. Levine's testimony, and was not her language. The term '' exhibiting '' implies some affirmative act on the part of a person so charged. That element is totally missing from the testimony of Mrs. Levine.

Assuming the order or mandate was sufficiently clear and actually directed to petitioner and so understood by him, the basic question is, was it lawful mandate, and not merely irregular or erroneous? The fact that one may differ with the philosophical views held by another, or be outraged by the fact that he permitted himself to be engaged in a conversation, is a slender reed upon which to premise the legality of the directive. It should sufficiently appear from credible evidence that petitioner's presence or his acts, or both, constituted a threat to the proper conduct of the trial or jeopardized the rights of the accused to a fair trial. We have never excluded from a courtroom any person merely because his views were sympathetic to those of an accused, if otherwise his conduct and demeanor were satisfactory.

Here we have the testimony of Mrs. Levine, the only sworn testimony in the record. Her curiosity led her to speak to a man who, in her own words, was '' minding his own business.'' The words *Right On* on a paper beside him while he was eating a sandwich aroused her interest, and *she* engaged him in a conversation. Hers was the approach. They did not discuss the case. She had not seen the man talking to anyone else or distributing anything. After excusing Mrs. Levine, the court then actually issued its mandate to the court personnel. The validity or invalidity of the mandate must be determined as of that time. It is submitted there was nothing then in the record which warranted or legalized the order.

While the rights of the accused in a trial should always receive adequate protection, something more than a mere personal predilection should appear to indicate such rights are jeopardized. Criminal contempt involves a possible loss of liberty, a fine, or both, and the rule *strictissimi juris* controls. Disobedience of a lawful mandate subjects the offender to penalties because of the public interest involved. The power should be exercised only where necessary or clearly warranted.

The record is silent with regard to the actual content of the papers in petitioner's possession. It cannot be concluded, intelligently, that the papers by reason of their content would interfere or tend to interfere with the orderly administration of

justice. Segments of the daily press have from time to time criticized a Judge, the conduct of a trial, and even the courts generally. We have not held, by reason thereof, that the writers or the papers in which such articles appeared should be barred from courtrooms. (See *Matter of Oliver* v. *Postel,* 30 N Y 2d 171.) "The law is settled that the contempt power may not be utilized to impose punishment for the publication of out-of-court statements relating to a pending court proceeding, except where such statements are shown to present ' a clear and present danger ' or ' a serious and imminent threat ' to the administration of justice " (*Matter of Oliver* v. *Postel,* p. 180). No such threat or danger is shown here. Treatment of a class should be uniform unless a good and sufficient reason is shown which justifies discriminatory treatment. None is shown here. What is shown here is a conversation between a woman, a prospective juror, and a man whose name was then unknown to any person present, an assurance that the case was not discussed, the possession of a paper headed *Right On,* and the issuance of a directive. Petitioner was not present when Mrs. Levine was interrogated, he was given no warning, no opportunity to respond to charges, but was summarily informed of the directive. In this sequence there would appear to be a denial of due process — both at this stage and at the later adjudication of contempt — and an undue limitation upon petitioner's freedom of speech and of the press (U. S. Const., 1st, 5th and 14th Amdts.; *Bridges* v. *California,* 314 U. S. 252). At the very least petitioner should have been given notice of the charges, which should have been clear and concise, and an opportunity to be heard. Moreover, as stated earlier, very little information relative to the contents of the paper *Right On* appears in this record. "Due process of law * * * in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed " (*Cooke* v. *United States,* 267 U. S. 517, 537; *Bloom* v. *Illinois,* 391 U. S. 194, 205; see, also, *Wisconsin* v. *Constantineau,* 400 U. S. 433).

The requirement for a hearing is set forth clearly in the 1948 case of *Matter of Oliver* (333 U. S. 257, 275) in which the United States Supreme Court stated that due process dictates the need

for an evidentiary hearing except in those cases where misconduct in open court " disturbs the court's business " and " where immediate punishment is essential to prevent ' demoralization of the court's authority ' before the public." This simply was not the case here.

The majority opinion in *Oliver* also stated that a hearing was required if " some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements " (*supra*). The above fits the case here.

This case may be distinguished from such cases as *United States* v. *Mine Workers* (330 U. S. 258) and *Walker* v. *City of Birmingham* (388 U. S. 307). In those cases an injunction had issued. Disobedience to the orders led to the later adjudications of contempt. It should be noted that in each instance the underlying order was free of procedural defects. Here the first directive of the court was defective, not only because it was vague and given outside of the courtroom, but also because it was based on testimony given in the absence of petitioner who was not represented by counsel.

The later adjudication of contempt was based upon a determination by the court that petitioner disobeyed its earlier order to stay out of the courtroom. It was not based upon any disorder then caused or created by petitioner. As such it suffers from the infirmity of the earlier directive. The repeated order of the court to " put him in " (confinement) without a hearing amounted to a deprivation of liberty without due process of law.

The penalty imposed, $250 or 10 days, is popularly referred to as an " either or " penalty. Yet no opportunity was afforded petitioner to raise the money. In effect, the penalty was a direction for immediate confinement. The denial of even a brief stay at *nisi prius* is somewhat unusual for this type of case.*

While a trial court has inherent authority to limit public attendance in certain situations in the interest of sound judicial administration (*People* v. *Jelke,* 308 N. Y. 56, 63), may limit the number, or even temporarily exclude spectators from a courtroom (*People* v. *Miller,* 257 N. Y. 54, 60), the situations in which the exercise of such power have been upheld are not fairly comparable to the case before us.

The power to punish for contempt is inherent in and ancillary to the judicial power. While broad in scope it is limited by the guarantees of the Constitution. It is questionable

---

* I am unable to find support in this appellate record for the statements appearing in the footnote (p. 199) of the majority opinion.

whether respondent should have made the final determination in light of the abusive language directed toward the court following upon the issuance of its earlier directive. The element of personal criticism contained in petitioner's statements created a delicate situation which emphasized the need for avoidance of arbitrary or oppressive conclusions, especially where no hearing was afforded petitioner. It would have been preferable, if possible, to send the matter to a brother Judge so that any action which followed would be free of any suspicion of possible reprisal (*Mayberry* v. *Pennsylvania*, 400 U. S. 455, 466).

The New York State Legislature, recognizing that in criminal contempt punishment is imposed to vindicate the authority of the court, yet concerned that the liberty of the individual be protected and judicial tyranny be avoided, hedged the exercise of the power with certain restrictions which alone can form the basis for criminal contempt. The need should be clear, exercised with care, but with firmness to avoid either too great a leniency or too oppressive a penalty.

For the reasons heretofore enumerated I dissent, vote to reverse, vacate the contempt and remit the fine.

NUNEZ, TILZER and CAPOZZOLI, JJ., concur with McGIVERN, J.; STEVENS, P. J., dissents in an opinion.

Application denied and the petition dismissed without costs and without disbursements.